# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| ALEX MIRVIS, individually and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br>v.<br><br>SNOWFLAKE, INC. and AT&T INC.,<br><br>Defendants. | NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Alex Mirvis ("Plaintiff"), individually and on behalf of the Class of similarly situated persons (defined below), alleges the following against Defendants Snowflake, Inc. ("Snowflake") and AT&T, Inc. ("AT&T"), (collectively, "Defendants"), based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## SUMMARY OF THE CASE

1.     This action arises from Defendants' failure to secure the personal identifiable information ("PII")[1] of Plaintiff and the members of the proposed Class

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or

and Subclass, where Plaintiff and Class Members are current and former employees, customers, and others who provided their PII to Snowflake's clients, including AT&T, who in turn used Snowflake's cloud-based data hosting platform to share and maintain PII.

2.    Snowflake is a cloud storage service with a nearly 20% share of the data hosting market and is used by 9,437 customers, including globally ranked, industry leading companies such as Defendant AT&T, Adobe, Kraft Heinz, Mastercard, HP, Nielsen, Novartis, PepsiCo, Siemens, Advance Auto Parts, Ticketmaster, Santander Bank, Anheuser-Busch, Allstate Insurance, Mitsubishi, Neiman Marcus, Progressive, State Farm and NBC Universal among many others.[2]

3.    According to Mandiant, starting in or about mid-April 2024, an unauthorized party began to use Snowflake customer credentials, acquired using infostealer malware, to access the Snowflake platform and to target and acquire the unencrypted PII stored thereon (the "Data Breach").[3] The threat actor continued to

---

identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Seraiu Gatlan, *Advance Auto Parts stolen data for sale after Snowflake attack*, BLEEPING COMPUTER (June 5, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-stolen-data-for-sale-after-snowflake-attack/; Symmetry, *What We Know So Far about the Snowflake "Breach",* https://www.symmetry-systems.com/blog/what-we-know-so-far-about-the-snowflake-breach/

[3] https://www.securityweek.com/snowflake-attacks-mandiant-links-data-breaches-to-infostealer-infections/

access the Snowflake platform until approximately May 22, 2024, when Snowflake was alerted to additional compromised customer accounts by Mandiant.[4]

4. Notably, many of the compromised access credentials had been acquired as early as 2020 and Snowflake could have prevented this Data Breach by requiring all accounts to regularly update their passwords to current standards, monitor infostealer marketplaces for compromised credentials, and prevent access to the platform by these accounts until the compromised passwords had been updated accordingly. Moreover, Snowflake should have but did not require its clients to implement multi-factor authentication as a condition of accessing the platform. Had this basic security feature been required by Snowflake, none of the compromised account credentials could have been used to successfully access the platform. Snowflake could also have better monitored its systems to detect unusual activity or activity associated with unauthorized access, including by implementing IP filters and limiting access to its network environment to only necessary users.

5. On or about July 12, 2024, Defendant AT&T admitted that information about more than 100 million of its customer's cellular telephone calls and texts were exposed in a massive data breach in or about April of 2024.

---

[4] https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion

6.     According to AT&T, the compromised data includes the telephone numbers of "nearly all" of its cellular customers and the customers of wireless providers that use its cellular customers and the customers of wireless providers that use its network between May 1, 2022, and October 31, 2022. The stolen logs contain a record of virtually every number AT&T customers called or texted – including customers of other wireless networks – the number of times they interacted and the call duration. Records of customers in January of 2023 may also be implicated, as well as AT&T landline customers who interacted with those cell numbers.

7.     Unfortunately for Plaintiff and Class Members, Defendant Snowflake failed to implement basic and expected data security practices appropriate to the vast amounts of PII stored on its platform and, as a consequence, records containing the PII of millions of individuals from over 165 organizations that used the Snowflake platform were accessed and acquired by the threat actors during the Data Breach.[5]

8.     Defendants collectively enabled an unauthorized third party to gain access to and obtain former and current AT&T customers' Private Information from AT&T's systems housed by Snowflake.

9.     While the records exfiltrated in the Data Breach vary, according to the organization using the Snowflake platform, the unlawfully accessed PII includes,

---

[5] *See* Mandiant initial Report, available at
https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion

Social Security numbers, names, dates of birth, email addresses, physical addresses, telephone numbers, driver's license information, payroll information, financial account information, and other confidential personal data.[6]

10.    Soon after they exfiltrated the PII from Snowflake's platform, the threat actors attempted to extort payments from Snowflake's clients and began publishing samples of the stolen consumer PII on dark web marketplaces for sale to identity thieves and fraudsters. According to Mandiant, additional extortion attempts were reported by Snowflake's clients as recently as June 13, 2024.[7] Additional consumer PII continues to be published to dark web marketplaces in large batches, including a batch of one million Ticketmaster customer records released on June 21, 2024.[8]

11.    As a result of the Data Breach, Plaintiff and millions of Class Members were injured and the confidentiality of their PII was destroyed and commoditized by data thieves. Plaintiff and Class Members were entitled to, and did, expect a sophisticated data hosting company to take reasonable steps to prevent unauthorized access to their PII. Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement

---

[6] https://www.malwarebytes.com/blog/news/2024/06/advance-auto-parts-customer-data-posted-for-sale; https://www.securityweek.com/santander-employee-data-breach-linked-to-snowflake-attack/; *see also supra*, n. 2.

[7] https://www.cybersecuritydive.com/news/snowflake-customer-attacks-what-we-know/719056/

[8] https://www.malwarebytes.com/blog/news/2024/06/first-million-breached-ticketmaster-records-released-for-free

reasonable measures to safeguard PII from unauthorized access and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its actions and omissions.

12. Further exacerbating Plaintiff's injuries, Defendants have offered insufficient assurances that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their security practices, sufficiently blacklisted all compromised credentials and limited access to their network environments or dedicated sufficient resources and staff to avoid a similar breach of their network in the future.

13. Plaintiff and Class Members would not have entrusted their confidential PII to companies that utilized Snowflake's platform, such as AT&T, had they known that Snowflake would fail to implement proper password standards, fail to require its clients to regularly change passwords, fail to monitor dark web marketplaces for compromised access credentials, or fail to monitor their network for suspicious activity or limit access to necessary users.

14. Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to

obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16.     Through this Complaint, Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of himself and all similarly situated individuals whose PII was accessed.

17.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## **JURISDICTION AND VENUE**

18.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is in the millions, many of whom, including Plaintiff, have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19.     The Court has general personal jurisdiction over Defendant Snowflake because its headquarters and principal place of business is located in Bozeman, Montana.

20.     Defendant AT&T is subject to personal jurisdiction in Montana based on sufficient minimum contacts that exist between Defendant AT&T and Montana, and the decisions affecting consumers data privacy stored on the Snowflake Data Cloud stem from communications between Defendant AT&T and Montana-based Defendant Snowflake. Defendant AT&T advertises, solicits, and does business in Montana and has purposefully availed itself to the protections of Montana law and should reasonably expect to be hauled into court in this District

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Snowflake's principal place of business is located in this District and the acts or omissions giving rise to Plaintiff's claims emanated in this District.

## **PARTIES**

22.     Plaintiff Alex Mirvis is a citizen of New York.

23.     Defendant Snowflake is a Delaware corporation with its headquarters and principal place of business located at 106 E. Babcock Street, Suite 3A, Bozeman, Montana 59715.

24.     Defendant AT&T is a Delaware corporation with its principal place of business located at 208 South Akard Street, Dallas, Texas 75202.

## FACTUAL ALLEGATIONS

### A. The Data Breach

25.    From about mid-April 2024, a group known as "ShinyHunters" began a prolonged series of hacks into Snowflake's network and ultimately accessed, obtained, and exfiltrated hundreds of millions of detailed consumer records containing the PII of Plaintiff and Class Members, including their Social Security numbers, names, dates of birth, email addresses, physical addresses, telephone numbers, driver's license information, payroll information, financial account information, and other confidential PII.

26.    The attackers managed to gain entry to the Snowflake platform on which Defendant Snowflake's clients stored PII by using stolen access credentials from as early as 2020 and which had long been made available on dark web marketplaces.[9] Defendant Snowflake knew that its clients, including AT&T, stored unencrypted PII on its platform and knew that such data was a motivating target for cyberattackers who monetize the information or use it themselves to commit fraud and identity theft.

27.    In the years immediately preceding the Data Breach, Defendants knew or should have known that Defendant Snowflake's platform was a target for

---

[9] https://www.wired.com/story/epam-snowflake-ticketmaster-breach-shinyhunters/

cybersecurity attacks because warnings were readily available and accessible via the internet.

28.    In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[10]

29.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that"[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[11]

30.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious

---

[10] FBI, *High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations* (Oct. 2, 2019) (emphasis added), available at https://www.ic3.gov/Media/Y2019/PSA191002

[11] ZDNet, *Ransomware mentioned in 1,000+ SEC filings over the past year* (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/

actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[12]

31.     Companies should treat these attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[13] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[14] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[15]

32.     Despite this knowledge, and the knowledge that access credential theft is an increasingly common attack vector, Defendant Snowflake failed to implement basic security features that would detect and prevent such an attack. Indeed,

---

[12] U.S. CISA, Ransomware Guide – September 2020, *available at* https://www.cisa.gov/sites/default/files/publications/CISA_MS ISAC_Ransomware%20Guide_S508C_.pdf
[13] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends
[14] *Id.*
[15] *Id.*

cybersecurity experts have been increasingly vocal about the increase in infostealer attacks and the need to protect against them.[16]

33. Ultimately Defendant Snowflake could have prevented this attack, which relied on the use of passwords compromised, including in some case four years prior, by, inter alia: 1) requiring all accounts to regularly update their passwords to current industry standards; 2) monitoring infostealer marketplaces for compromised credentials and preventing access to the platform by these accounts; 3) requiring its clients to implement multi-factor authentication as a condition of accessing the platform; 4) requiring its client to encrypt data on its platform; 5) monitoring its network to detect unusual activity or activity associated with unauthorized access, including by implementing IP filters; and 6) limiting access to its network environment to only necessary users.

34. Given that Defendant Snowflake was storing the unencrypted PII of hundreds of millions of individuals, Defendant Snowflake could and should have implemented all of the above measures to prevent and detect the Data Breach.

35. Unfortunately for the Plaintiff and the Class Members' their PII has been posted for sale on the dark web by a known cybercriminal who uses the handle "Sp1d3r."[17]

---

[16] https://blog.sekoia.io/overview-of-the-russian-speaking-infostealer-ecosystem-the-logs/#h-logs-marketplaces
[17] *Id.*



18

36.     The leaked material contains multiple references to "SNOWFLAKE," showing that the PII affiliated with Snowflake's customers (such as AT&T) was stolen from Snowflake's platform.[19]

37.     On June 21, 2024, Sp1d3r posted another batch of one million Ticketmaster customer records, this time offering the credit card details of these customers for free to anyone willing to download the dataset.

---

[18] *Id.*
[19] *Id.*



38.     As evidenced by the Data Breach and subsequent posting of Class Member data on the dark web, the PII contained in Defendant Snowflake's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

39.     On July 12, 2024, AT&T announced that "customer data was illegally downloaded from [it's] workspace on a third-party cloud platform. We launched an investigation and engaged cybersecurity experts to understand the nature and scope of the criminal activity. We have taken steps to close off the illegal access point."

40.     This is the second massive data breach that AT&T has announced in 2024. In or about March 2024, Defendant AT&T admitted that it lost control over its current and former customers' highly sensitive personal information in a data breach perpetrated by cybercriminals (the "March 2024 Data Breach").

41.     The March 2024 Data Breach exposed the personal information of an estimated total of 73 million customers. Upon information and belief, this information includes full names, email addresses, mailing phone numbers, dates of birth, and Social Security numbers, as well as AT&T account numbers and AT&T encrypted passcodes that can be used to access AT&T customer accounts.

## B. The Value of PII

42.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

43.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[20]

44.     One example comes from when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As

---

[20] *Shining a Light on the Dark Web with Identity Monitoring, IdentityForce,* Dec. 28, 2020, https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited July 19, 2024).

data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[21]

45.   The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $2,009.[22] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[23] Criminals can also purchase access to entire company data breaches.[24]

46.   Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax

---

[21] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited July 19, 2024).

[22] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web- how-much-it-costs/ (last visited July 19, 2024).

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is- selling-for-on-the-dark-web/ (last visited July 19, 2024).

[24] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 19, 2024).

details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

47.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

48.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

49.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[25]

---

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions

50.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

51.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

52.    The existence and prevalence of "Fullz" packages means that the PII stolen from the Data Breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members.

_____

over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

53. Thus, even if certain information was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package to collect that missing information.

54. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

55. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

56. The market for PII has continued unabated to the present, and in 2023 the number of reported data breaches in the United States increased by 78% over 2022, reaching 3205 data breaches.[26]

57. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[27] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to

---

[26] Beth Maundrill, *Data Privacy Week: US Data Breaches Surge, 2023 Sees 78% Increase in Compromises*, INFOSECURITY MAGAZINE (Jan. 23, 2024); https://www.infosecurity-magazine.com/news/us-data-breaches-surge-2023/ (last visited July 19, 2024); *see also* Identity Theft Resource Center, 2023 Data Breach Report, https://www.idtheftcenter.org/publication/ 2023-data-breach-report/ (last visited July 19, 2024).

[27] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

marketers or app developers.[28] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[29]

58.     As a result of the Data Breach, Plaintiff' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the dark web, where it is now available and holds significant value for the threat actors.

## C. Defendant Failed to Comply with Regulatory Requirements and Standards.

59.     Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to consumers and employees. There are a number of state and federal laws, requirements, and industry standards governing the protection of PII.

60.     For example, at least 24 states have enacted laws addressing data security practices that require businesses that own, license, or maintain PII about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access.

61.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable

---

[28] https://datacoup.com/; see also https://digi.me/what-is-digime/.
[29] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. See, e.g., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

62.    In October 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

63.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for

security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

64.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65.     Defendants were at all times fully aware of their obligations to protect the PII on their networks yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from failure to do so.

66.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**D. Defendants Failed to Comply with Industry Practices.**

67.     Defendants' failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

68.     Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[30] All organizations collecting and handling PII, such as Defendants, are strongly encouraged to follow these controls.

69.     Several best practices have been identified that a minimum should be implemented by data management companies like Defendant Snowflake, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[31]

70.     Defendants failed to follow these and other industry standards to adequately protect the PII of Plaintiff and Class Members.

**E. The Data Breach Caused Injury to Plaintiff and Class Members and Will Result in Additional Harm Such as Fraud.**

---

[30] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited June 18, 2024).
[31] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf.

71.     The ramifications of Defendants' failure to secure Plaintiff' and Class Members' data are severe.

72.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[32] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[33]

73.     Identity thieves can use PII, such as that of Plaintiff and Class Members, which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

74.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS")

---

[32] 17 C.F.R. § 248.201 (2013).

[33] *Id.*

found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[34]

75.  The 2017 Identity Theft Resource Center survey[35] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;

- 67% reported anxiety;

- 66% reported feelings of fear related to personal financial safety;

- 37% reported fearing for the financial safety of family members;

- 24% reported fear for their physical safety;

- 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and

- 7% reported feeling suicidal.

76.  Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate / lack of focus;

---

[34] Victims of Identity Theft, Bureau of Justice Statistics (Sept. 2015) http://www.bjs.gov/content/ pub/pdf/vit14.pdf.
[35] *Id.*

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[36]

77.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[37]

78.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is

---

[36] *Id.*

[37] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

F. **Plaintiff and Class Members Suffered Damages.**

79.     As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have already been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, inter alia, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

80.     Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. theft and misuse of their personal and financial information;

b. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused via the sale of Plaintiff's and Class Members' information on the Internet's black market;

c. the improper disclosure of their PII;

d. loss of privacy;

e. ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

f. ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market;

g. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach; and

h. nominal damages.

81.    Defendants continue to hold Plaintiff's and Class Members' PII and Plaintiff and Class Members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

**G. Plaintiff Alex Mirvis's Experience**

82.    Plaintiff Alex Mirvis is a customer of AT&T and has been for several years preceding the Data Breach, including during 2022.

83.    Plaintiff's information was stored with Defendant as a result of their dealings with Defendant.

84.    As required in order to obtain services from Defendant, Plaintiff provided Defendant with highly personal, and financial information, who then possessed and controlled it.

85.    As a result, Plaintiff's information was among the data accessed by an unauthorized third-party in the Data Breach.

86.    At all times herein relevant, Plaintiff is and was a member of the Class.

87.    Plaintiff received an email from Defendant, dated July 18, 2024, stating that their private information was involved in the Data Breach (the "Notice").

88.    Plaintiff was unaware of the Data Breach until receiving that letter

89.     As a result, Plaintiff was injured in the form of lost time dealing with the consequences of the Data Breach, which included and continues to include: time spent verifying the legitimacy and impact of the Data Breach; time spent exploring credit monitoring and identity theft insurance options; time spent self-monitoring their accounts with heightened scrutiny and time spent seeking legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach.

90.     Plaintiff was also injured by the material risk to future harm they suffer based on Defendant's breach; this risk is imminent and substantial because Plaintiff's data has been exposed in the breach, the data involved, including Social Security numbers, is highly sensitive and presents a high risk of identity theft or fraud; and it is likely, given Defendant's clientele, that some of the Class's information that has been exposed has already been misused.

91.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of their PII—a condition of intangible property that they entrusted to Defendant, which was compromised in and as a result of the Data Breach.

92.     Plaintiff, as a result of the Data Breach, has increased anxiety for their loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling their PII and financial information.

93.     Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII and financial information, in combination with their name, being placed in the hands of unauthorized third parties/criminals.

94.     Plaintiff has a continuing interest in ensuring that their PII and financial information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

95.     Plaintiff brings this class action individually on behalf of himself and all members of the following Class and Subclass of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Class and Subclass:

**National Class**

> All persons residing in the United States whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

**New York Subclass**

> All persons residing in New York whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

96.     Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have

a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

97.    Plaintiff reserves the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

98.    <u>Numerosity</u>: The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that hundreds of millions of individuals' information was exposed in the Data Breach.

99.    <u>Commonality and Predominance</u>: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, inter alia:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

    c.    Whether Defendants' computer systems and data security practices used to protect Plaintiff's and Class Members' PII

violated the FTC Act and/or state laws, and/or Defendants' other duties discussed herein;

d.      Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e.      Whether Defendants unlawfully shared, lost, or disclosed Plaintiff's and Class Members' PII;

f.      Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.      Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h.      Whether Plaintiff and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i.      Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff' and Class Members' PII;

j.  Whether Defendants breached duties to protect Plaintiff's and Class Members' PII;

k.  Whether Defendants' actions and inactions alleged herein were negligent;

l.  Whether Defendants were unjustly enriched by their conduct as alleged herein;

m.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

n.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

o.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

100.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

101.  <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class Members. Plaintiff, like all proposed members of the Class, had his PII compromised

in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

102.   Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to, or conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

103.   Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

104. <u>Injunctive and Declaratory Relief</u>: Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

105. Likewise, particular issues are also appropriate for certification under Rule 24(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this mater and the parties' interests therein. Such issues include, but are not limited to: (a) whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in preventing unauthorized access Plaintiff's and the Class Members' PII; (b) whether Defendants failed to adequately monitor and audit their data security systems; and (c) whether Defendants failed to take reasonable steps to safeguard the PII of Plaintiff and Class Members.

106. All members of the proposed Class are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

**(On Behalf of Plaintiff and the Class against Snowflake and AT&T)**

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

108. Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

109. Defendants knew or reasonably should have known that the failure to exercise due care in the storing of the PII of Plaintiff and the Class involved an unreasonable risk of harm, even if the harm occurred through the criminal acts of a third party.

110. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that the PII of Plaintiff and the Class in Defendants' possession was adequately secured and protected.

111. Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiff and the Class.

112. Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

113.  A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

114.  Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for ensuring proper access credentials and encrypting PII stored on Defendants' systems.

115.  Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

116.  Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

117.  Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to (i) take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties and (ii) prepare for the sharing and detrimental use of their sensitive information.

118. Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and the Class.

119. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Class during the time the PII was within Defendants' possession or control.

120. Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

121. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Class in the face of increased risk of theft.

122. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

123.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

124.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

125.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT II
## NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class against Snowflake and AT&T)

126.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

127.    Defendants had duties arising under the FTC Act to protect Plaintiff's and Class Members' PII.

128.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

129. Defendants breached their duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

130. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

131. Plaintiff and Class Members are within the class of persons the statutes were intended to protect and the harm to Plaintiff and Class Members resulting from the Data Breach was the type of harm against which the statutes were intended to prevent.

132. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

133. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

134. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (On Behalf of Plaintiff and the Class against Snowflake)

135.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

136.   On information and belief, Defendant Snowflake entered into contracts with its clients, including AT&T, to provide data hosting platform services.

137.   In exchange, Defendant Snowflake agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class and to timely and adequately notify them of the Data Breach.

138.   On information and belief, these contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant Snowflake and its clients. Defendant Snowflake knew that, if it were to breach these contracts with its clients, the clients' patients and employees—Plaintiff and Class Members—would be harmed.

139.   Defendant Snowflake breached the contracts entered into with its clients, such as AT&T, by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff and Class Members' Private Information from

unauthorized disclosure to third parties, and (iii) promptly and adequately notify Plaintiff and Class Members of the Data Breach.

140. Plaintiff and the Class were harmed by Defendant Snowflake's breaches of contract, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

## COUNT IV
## BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Class against AT&T)

141. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

142. Defendant AT&T entered into written contracts with Plaintiff and the Class to provide cellular services.

143. In exchange, Defendant AT&T agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class and to timely and adequately notify them of a Data Breach.

144. Defendant AT&T breached the contracts entered into with Plaintiff and the Class by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notify Plaintiff and Class Members of the Data Breach.

145.    Plaintiff and the Class were harmed by Defendant AT&T's breaches of contract, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

146.    Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

147.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

148.    Defendants knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from Plaintiff's retained data and commercialized and used Plaintiff's and Class Members' PII for business purposes.

149.    Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including payments on behalf of or for the benefit of Plaintiff and Class Members.

150.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

151.   Defendants failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

152.   Defendants acquired the PII through inequitable means as they failed to disclose the inadequate data security practices previously alleged. If Plaintiff and Class Members had known that Defendants would not fund adequate data security practices, procedures, and protocols to sufficiently monitor, supervise, and secure their PII, they would not have entrusted their Private Information to Defendant Snowflake or obtained services from Defendant's clients including AT&T.

153.   Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own benefit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their PII.

154.   Plaintiff and Class Members have no adequate remedy at law.

155.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

156.   As a direct and proximate result of Defendants' conduct, Plaintiff and other Class Members have suffered actual harm in the form of experiencing specific acts of fraudulent activity and other attempts of fraud that required Plaintiff's efforts to prevent from succeeding.

157.   As a result of Defendants' wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendants and all other relief allowed by law.

**COUNT VI**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff Alex Mirvis and the New York Subclass)**

158.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

159.   New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

160.   The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the other Class Members seek monetary damages.

161. Defendant misleadingly and deceptively represents the security of its data systems to consumers.

162. Defendant further omitted material facts, including its negligent security systems and latent vulnerabilities in its servers that allowed for the compromise at the center of the Data Breach.

163. Defendant's unlawful consumer-oriented conduct is misleading materially because Plaintiff and the other class members believed that the PII entrusted with Defendant was secure, and that it would not be unlawfully revealed or disclosed to unauthorized parties.

164. Plaintiff and other Class Members sought services from Defendant in part because they believed Defendant to be trustworthy and that any PII shared with Defendant would be kept securely. Had Plaintiff and reasonable customers known that Defendant would not keep their PII secure and would maintain vulnerabilities that would permit disclosure of Plaintiff and the Class' PII to unauthorized third parties, they would not have sought out Defendant's health care services at all or not and have paid as much for them

165. Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

166. Plaintiff and other Class Members have been injured inasmuch as they, accepting Defendant's representations and omissions concerned its data security,

entrusted their data with Defendant. Accordingly, Plaintiff and other Class Members paid more than the services and data security they bargained for and received were worth.

167.   Defendant's conduct as alleged herein constitutes a deceptive act and practice in business conduct violating New York General Business Law §349(a), and Plaintiff and other Class members have been damaged thereby.

168.   As a result of Defendant's deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs. This includes actual damages under GBL § 349 and statutory damages of $50 per unit purchased pursuant to GBL § 349.

**COUNT VII**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff Alex Mirvis and the New York Subclass)**

169.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

170.   Plaintiff brings this cause of action individually and on behalf of the New York Subclass.

171.   N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

172.   N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

173. Defendant's advertising fails to reveal a material fact: specifically, that its servers are not secure and contain latent vulnerabilities and are negligently managed, meaning that Plaintiff and the Class' PII, which they entrust with Defendant, will be unlawfully disclosed to unauthorized third-parties.

174. Defendant's advertising and notices contain serious omissions and deceptions as to the efficacy of its data security.

175. Defendant engaged in unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

176. Defendant's material misrepresentations and omissions were uniform.

177. As a result of Defendant's acts and practices in violation of GBL § 350, Plaintiff and class members are entitled to monetary and compensatory damages, restitution, and disgorgement of all monies obtained using Defendant's unlawful

conduct, interest, and attorneys' fees and costs, as well as statutory damages of $500 per Product purchased

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of themself and each member of the proposed National Class and the New York Subclass, respectfully request that the Court enter judgment in their favor and for the following specific relief against Defendant as follows:

A.      Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMAND

Plaintiff, individually and on behalf of the Plaintiff Class(es) and/or Subclass(es), hereby demands a trial by jury for all issues triable by jury.

Date: July 23, 2024                    Respectfully submitted,

_/s/ John Heenan_
John Heenan
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091
John@lawmontana.com

Philip M. Hines, Esq.
**HELD & HINES LLP**
2004 Ralph Avenue
Brooklyn, New York 11234
Tel: (718) 531-9700
Fax: (718) 444-5768
phines@heldhines.com

James A. Francis, Esq.*
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510

Philadelphia, PA 19103
T:215-735-8600
F: 215-940-8000
jfrancis@consumerlawfirm.com


Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
klaukaitis@laukaitislaw.com

*pro hac vice* forthcoming


*Attorneys for Plaintiff and the Proposed Class*